In re The CONFERENCE OF AFRICAN
UNION FIRST COLORED METHODIST
PROTESTANT CHURCH, Debtor.

MOTHER AFRICAN UNION
METHODIST CHURCH,

v.

The CONFERENCE OF AUFCMP
CHURCH.

Bankruptcy No. 95–308 HSB.
A–95–2078.

United States Bankruptcy Court,
D. Delaware.

April 28, 1995.

Edith H. Hull–Johnson, Georgetown, DE, K. Kay Shearin, Elsmere, DE, for debtor.

Michael F. Foster, Dept. of Justice, Wilmington, DE, for Vice Chancellor.

Paulette Sullivan Moore, Thomas S. Neuberger, Wilmington, DE, for Mother African Union First Colored Methodist Protestant Church.

Norman L. Pernick, Trustee, Saul, Ewing, Remick & Saul, Wilmington, DE.

MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

### *INTRODUCTION*

In this Chapter 7 case I have been asked to consider five motions: (1) a creditor's lift stay motion, (2) Debtor's motion to have parties held in contempt for violating the automatic stay order of 11 U.S.C. § 362(a),[1] (3) Debtor's motion to enforce the stay order, (4) the motion of the controlling person of Debtor to have parties held in contempt for violating the automatic stay order, and (5) the motion of the controlling person of Debtor to enforce the stay order. Because I find the two civil contempt motions are without merit, I will deny them. I also find that the interests of justice are best served by having pending Delaware state court proceedings resolve the long standing disputes between Debtor and the lift stay movant, and therefore I would be disposed to grant the lift stay motion and deny the two motions to enforce the stay order. However, because I conclude that the petition filing constitutes an abuse of the bankruptcy process, I will grant broader relief by dismissing this Chapter 7 case.

This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 151, 157 and 1334(a) and (b), and pursuant to the District Court's July 23, 1984 omnibus order of reference.

### *FACTS*

This Chapter 7 case is the latest phase of protracted and acrimonious litigation involving the Conference of African Union First Colored Methodist Protestant Church ("the Conference") and the Mother African Union First Colored Methodist Protestant Church ("the Mother Church") which has twisted through the courts since 1991. The factual record regarding the litigation is somewhat convoluted. I will describe only the highlights of the litigation events in order to reach an understanding of the issues before me.

The Mother Church is a Delaware corporation incorporated in 1813. The Conference is a Delaware corporation incorporated in 1941. The Conference is a religious association that was created as a corporate vehicle to facilitate the voluntary association or affiliation of various African Methodist Protestant churches in a spiritual enterprise. Numerous local churches are affiliated with the Conference, and until April 1991, the Mother Church and the Conference had an affiliation built upon their mutual spiritual interests. The precise nature of this relationship was unclear and became the basis of the dispute between the parties.

In early April 1991, Rev. Delbert L. Jackson ("Rev. Jackson"), the religious and corporate head of the Conference, learned that the Mother Church was scheduled to hold a meeting to consider seceding from the Conference. In response to that development, Rev. Jackson caused deeds to be executed and recorded that purportedly transferred the Mother Church's properties to the Conference. At that time, the Mother Church owned three properties in Wilmington, Delaware: the church building, the pastor's home, and a cemetery. A meeting of the Mother Church was held and its members voted to secede from the Conference.

Upon the Mother Church's declaration of secession from the Conference, a dispute arose between the two entities regarding ownership rights to the properties. In mid-April 1991, the Mother Church and two trustees of the Mother Church acting individually and on behalf of a class of persons

---

1. 11 U.S.C. § 362(a) provides, in pertinent part:

 (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 . . . operates as a stay, applicable to all entities, of—

 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

 (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title.

11 U.S.C. § 362(a)(1) and (2) (hereinafter, 11 U.S.C. § 101 *et seq.* is cited as "Code § ———.").

similarly situated, filed an action in the Chancery Court for the State of Delaware for declaratory and injunctive relief. *Mother Church, Comegys and Gardner v. The Conference and Delbert Jackson,* Del.Ch., C.A. No. 12055.

The Chancery Court entered a temporary restraining order prohibiting the Conference and Rev. Jackson from "interfering with the quiet title, operation, use, enjoyment and governance of The [Mother] Church facilities" during the days and times specified in that order. *The Mother Church v. The Conference,* Del.Ch., C.A. No. 12055, Jacobs, V.C. (Apr. 19, 1991) (ORDER). After a hearing, the Chancery Court granted the Mother Church's motion for a preliminary injunction and continued in effect the temporary restraining order until further order of the court. The Chancery Court found that "(a) the Mother Church owns the properties at issue, and (b) the April 6, 1991 deed purporting to transfer those properties to the Conference was void *ab initio.*" *Mother Church v. The Conference,* Del.Ch., C.A. No. 12055, Jacobs, V.C., Mem.Op. at 15 and 21, 1991 WL 85846 (May 15, 1991).

Immediately prior to the grant of the preliminary injunction, St. Paul's Church, a Washington, D.C. church that is a member of the conference, filed a complaint in the United States District Court for the District of Delaware. *St. Paul's Church v. Comegys, Gardner, et al.,* C.A. No. 91–272–JR. That complaint alleged that the Chancery Court temporary restraining order violated the Federal Civil Rights Act and the United States Constitution. Contemporaneously with the filing of the complaint, St. Paul's Church moved the District Court to temporarily restrain the Mother Church trustees from, *inter alia,* continuing to prosecute the ongoing Chancery Court action. During the oral argument on that motion, the District Court, in denying St. Paul's motion, admonished St. Paul's to carefully consider whether it was subject to the earlier temporary restraining order issued by the Chancery Court, which bound Rev. Jackson "and his agents, employees, officers, successors, assigns, and all others acting in concert with him." The District Court later dismissed the St. Paul's Church action on the ground of the federal abstention doctrine. *St. Paul's Church v. Comegys, et al.,* C.A. No. 91–272–SLR, Robinson, J. (Mar. 24, 1992) (MEM. OP.). That ruling was affirmed by the Third Circuit Court of Appeals. *St. Paul's Church v. Comegys, et al.,* No. 92–7149, 1992 WL 464355, 1992 U.S.App. LEXIS 31527 (3rd Cir. Oct. 9, 1992).

In response to the District Court action, the Mother Church filed a motion in the Chancery Court for a rule to show cause why the Conference and Rev. Jackson should not be held in contempt, alleging, *inter alia,* that prosecution of the District Court action constituted contempt of the temporary restraining order prohibiting Rev. Jackson, his agents, and all others acting in concert with him from interfering with the quiet title, use, enjoyment and governance of the Mother Church. The Chancery Court determined that the Conference's filing of the District Court action did not constitute civil contempt. *The Mother Church v. The Conference,* Del.Ch., C.A. No. 12055, Jacobs, V.C., Mem.Op. at 20, 1992 WL 83518 (Apr. 22, 1992).

The Mother Church also sought to have the Conference and Rev. Jackson held in civil contempt for using the Mother Church's facilities in violation of the injunction. The Chancery Court denied that relief but found that the Conference's counsel's inconsistent positions regarding certain representations formed the basis for a Chancery Court Rule 11 violation and imposed the following sanctions: (1) counsel was ordered to pay the Mother Church reasonable attorney's fees, and (2) a copy of the Chancery Court opinion was forwarded to Disciplinary Counsel of the Board of Professional Responsibility for further proceedings as Disciplinary Counsel deemed warranted. *Mother Church v. The Conference,* Del.Ch., C.A. No. 12055, Jacobs, V.C., Mem.Op. at 10, 1992 WL 111257 (May 20, 1992). On appeal, the Supreme Court affirmed the judgment of the Chancery Court. *The Conference v. The Mother Church,* Del.Supr., No. 96, 1993, 1993 WL 433524, Moore, J. (Oct. 14, 1993) (ORDER), *cert. denied,* —— U.S. ——, 114 S.Ct. 637, 126 L.Ed.2d 595 (1993).

The dollar amount of the sanctions imposed upon the Conference's counsel was later set forth in the Chancery Court's Superseding Final Order and Judgment. *The Mother Church v. The Conference*, Del.Ch., C.A. No. 12055, Jacobs, V.C., Superseding Final Order and Judgment at 3 (Feb. 24, 1993). The Superseding Final Order and Judgment also finalized the Chancery Court's finding in favor of the Mother Church as to the ownership of the properties and permanently enjoined the Conference and Rev. Jackson from interfering with those property rights. Furthermore, that order awarded the Mother Church costs and counsel fees against the Conference in the amount of $10,260. *Id.* at 3–4. No payment was made on that obligation.

In December 1993 the Conference executed a quitclaim deed to some of the Mother Church's property and in May 1994 brought, through another attorney, an action against the Mother Church in the Chancery Court in Sussex County alleging that the Mother Church was contractually bound to convey title to all of its real property to the Conference. *The Conference v. The Mother Church*, Del.Ch., C.A. No. 1674–S. In response to the filing of C.A. No. 1674 in Sussex County, the Mother Church filed a motion in C.A. No. 12055 in New Castle County seeking to have the Conference and Rev. Jackson held in civil contempt of the Superseding Final Order and Judgment.

By an Order Enforcing Superseding Final Order and Judgment, the Chancery Court denied the Mother Church's motion to hold the Conference and Rev. Jackson in civil contempt for filing C.A. No. 1674. *The Mother Church v. The Conference*, Del.Ch., C.A. No. 12055, Jacobs, V.C., Order Enforcing Superseding Final Order and Judgment at 2 (Jul. 6, 1994). However, the motion was denied without prejudice to the Mother Church's right to renew the motion for good cause. *Id.* Additionally, the Chancery Court ordered that the $10,260 of costs and fees previously assessed against the Conference be paid no later than July 15, 1994, and made Rev. Jackson jointly and severally liable for payment of that obligation in the event the Conference did not pay it by July

20, 1994. *Id.* Neither the Conference nor Rev. Jackson made payment to the Mother Church. Consequently, the Mother Church took steps to execute upon Rev. Jackson's property. No steps were taken to execute upon the property of the Conference.

The Conference filed a motion in the Chancery Court for a stay of execution pending appeal of the Order Enforcing Final Superseding Order and Judgment. The Chancery Court denied that motion. The Conference filed a motion for a stay pending appeal in the Delaware Supreme Court. The Delaware Supreme Court granted the motion, and ordered execution of any judgment in C.A. No. 12055 to be stayed pending appeal, such stay to be in effect until issuance of a mandate. The stay was conditioned upon the deposit of $11,000 in cash with the Clerk of the Supreme Court as supersedeas. *The Conference v. The Mother Church*, Del.Supr., No. 297, 1994, Walsh, J. (Oct. 19, 1994) (ORDER). Rev. Jackson deposited $11,000 as supersedeas and execution against his property was stayed.

On March 3, 1995, the Delaware Supreme Court affirmed the Order Enforcing Superseding Final Order and Judgment. *The Conference v. The Mother Church*, Del.Supr., No. 297, 1994, 1995 WL 111029, Ridgely, J. (Mar. 3, 1995) (ORDER) (Ridgely, President Judge, Superior Court, sitting by designation). Prior to the issuance of a mandate, the Conference petitioned the Supreme Court for a rehearing *en banc* and made another motion to stay execution pending appeal. These two matters were pending before the Supreme Court when the Conference filed its voluntary Chapter 7 petition on March 20, 1995.

During the course of the Conference's appeal from the Order Enforcing Superseding Final Order and Judgment, the Mother Church discovered that the Conference had executed the quitclaim deed in apparent violation of the Superseding Final Order and Judgment. Accordingly, in August 1994 the Mother Church filed a motion in C.A. No. 12055 seeking to void the deed and to have the Conference, Rev. Jackson and their counsel held in contempt for violating the Superseding Final Order and Judgment. In

July 1994 the Mother Church also filed a motion in C.A. No. 12055 seeking a contempt citation against the Conference, Rev. Jackson and their counsel for violating the Superseding Final Order and Judgment by filing the second Chancery Court action in Sussex County. These two motions were pending before the Chancery Court when the Conference filed its voluntary Chapter 7 petition on March 20, 1995.

The Conference immediately notified the Mother Church's counsel and the Chancery Court of the Chapter 7 petition filing. By a March 22, 1995 letter to counsel, the Vice Chancellor requested that counsel advise him of "your position on the effect of the pending bankruptcy filing on (i) the motion to dismiss C.A. No. 1674–S and (ii) the motion for contempt and sanctions in C.A. No. 12055." (Adv.Doc. # 9, p. 3) In response, counsel for the Mother Church requested "that the Court issue its rulings on all the pending motions that are before it with respect to Delbert Jackson, K. Kay Shearin, Esquire and Edith H. Hull–Johnson, Esquire." (Case Doc. # 7, Ex. A) Counsel for the Conference responded that the stay order had the effect of constraining counsel and the Chancery Court from examining the breadth of the stay. According to the Conference's counsel, the Chancery Court could only accept submissions "in the nature of status reports until [the bankruptcy court] lifts the automatic stay one way or the other." (Adv. Doc. # 9, p. 5) In a March 29, 1995 letter to counsel the Vice Chancellor expressed his view as follows:

> The pending contempt motions, however, do not appear to implicate any asset of the bankrupt, and, indeed, concern parties other than the bankrupt. Hence, those motions would remain unaffected by the stay. Counsel for the defendants assert otherwise, but have chosen to offer no argument to support their assertions.

> Accordingly, absent a contrary directive from the Bankruptcy Court, I do not con-

sider myself constrained from proceeding to decide the contempt motions.

(Case Doc. # 7, Ex. B)

On March 24, 1995, the Mother Church filed a motion in this Court for relief from the automatic stay (the "Lift Stay Motion"). On April 3, 1995, Debtor filed two motions in this Court: (1) Motion to Hold Vice Chancellor and Creditor In Civil Contempt For Violation of Automatic Stay ("Debtor's Contempt Motion"); and (2) Motion For Order Enforcing Automatic Stay ("Debtor's Enforcement Motion"). On April 3, 1995, Rev. Jackson also filed two motions in this Court: (1) Motion to Hold Vice Chancellor, Creditor and Counsel in Civil Contempt For Violating Automatic Stay ("Rev. Jackson's Contempt Motion") and (2) Motion For Order Enforcing Automatic Stay or For Order Staying Acts Against Debtor's Agent ("Rev. Jackson's Enforcement Motion"). A hearing on the five motions was held on April 13, 1995.

## DISCUSSION

### Rev. Jackson's Contempt Motion

After considering the written submissions of counsel regarding their views of the effect of Debtor's Chapter 7 filing on the matters pending before it, the Vice Chancellor advised counsel that because the pending contempt motions "do not appear to implicate any asset of the bankrupt, and, indeed concern parties other than the bankrupt" he would proceed to consider them. *The Mother Church v. The Conference*, Del.Ch., C.A. No. 12055, Jacobs, V.C. (Mar. 29, 1995) (LETTER OP.). Rev. Jackson claims that proceeding with the contempt motions is effectively a collection effort against Debtor which constitutes a willful violation of Code § 362(a) which, pursuant to Code § 362(h),[2] subjects the offending parties to a contempt citation and entitles Rev. Jackson to an award of attorneys' fees and treble punitive damages. Rev. Jackson's Contempt Motion states his position as follows:

> 6. Those [contempt] motions are a means of collecting claims against the

**2.** Code § 362(h) provides:
An individual injured by any willful violation of a stay provided by this section shall recover

actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

debtor from the Bishop personally, so continuing the proceedings against him while debtor's bankruptcy is pending is a willful violation of the letter and spirit of 11 *U.S.C.* § 362(h).

7. The Bishop has standing to move the Court for relief because he is injured by that violation, in that if he is forced to satisfy the debtor's debts to the Mother Church himself, the debtor will have no assets with which to indemnify him.

(Case Doc. # 7, p. 2)

Rev. Jackson misconstrues the matter which the Mother Church urged and which the Vice Chancellor agreed to consider. It is not the collection effort. The collection effort, i.e., the attempt to satisfy the $10,260 award of attorneys' fees and expenses against Rev. Jackson because the Conference failed to pay it, is one of the matters addressed by the Delaware Supreme Court in its March 3, 1995 order. Indeed, the posting of the $11,000 supersedeas deposit with the Supreme Court was effected in connection with the Supreme Court's consideration of the Chancery Court order which allowed the collection effort to go forward.

The Chancery Court contempt proceeding is not a collection effort against the Conference or against Rev. Jackson. It is an effort by the Mother Church to have certain persons punished for willful violations of Chancery Court orders. As I understand it, the proceeding relates to the contempt motions filed by the Mother Church in July and August 1994 to have certain parties held in contempt for two separate acts: (1) filing the second Chancery Court action in Sussex County, and (2) recording a quitclaim deed in December 1993. While those two motions appear to target the Conference as well as Rev. Jackson, Ms. Hull–Johnson and Ms. Shearin, the Mother Church requested and the Vice Chancellor agreed that the contempt proceeding would go forward only as to the "parties other than the bankrupt." (Case

Doc. # 7, Ex. B) While the consequence of having the contempt proceeding go forward may well result in personal liability for Rev. Jackson and may even trigger a claim by Rev. Jackson against Debtor, Rev. Jackson has no rights arising out of the automatic stay order to protect against that consequence. When a bankruptcy petition is filed, it is common practice for a non-bankruptcy court where an action is pending against the debtor and others to sever the action and proceed with the causes against the non-debtors. There is sound basis for this practice. Code § 362(a) only stays actions against the debtor and its property. Code § 362(a) does not stay actions against persons (or their property) who are related to the debtor or who are participants in the harm or liability underlying claims against the debtor. *Maritime Elec. Co. Inc. v. United Jersey Bank,* 959 F.2d 1194, 1205 (3d Cir.1991) ("The automatic stay is not available to non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor.") *Lynch v. Johns–Manville Sales Corp.,* 710 F.2d 1194, 1196–97 (6th Cir.1983) ("It is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantees, co-obligors, or others with a similar legal or factual nexus to the ... debtor.") Because the conduct of the Mother Church and its counsel in arguing for, and the Vice Chancellor in allowing, the contempt motions to proceed against Rev. Jackson did not implicate Code § 362(a), that conduct could not result in willful violations of the automatic stay order.

Under limited circumstances, pursuant to Code § 105(a),[3] the bankruptcy court may extend the Code § 362(a) stay order to protect non-debtor parties whose obligations may (a) trigger obligations against the debtor or (b) otherwise adversely impact the debtor during the bankruptcy proceeding. *See,* e.g., *In re American Film*

---

**3.** Code § 105(a) provides:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*Technologies, Inc.,* 175 B.R. 847 (D.Del.1994). However, any such extension must be the subject of a specific order by the bankruptcy judge following a hearing on notice. No such order has been issued in this Chapter 7 case.

### Debtor's Contempt Motion

Debtor's Contempt Motion asserts that the Mother Church and its counsel, in arguing to the Chancery Court for its continued consideration of the contempt motions, thereby engaged in actions to collect on a claim against Debtor and that such conduct constituted a willful violation of the stay order. Likewise, according to Debtor, the Vice Chancellor willfully violated the stay order when he agreed to continue to consider the contempt motions. Debtor's Contempt Motion states the essence of its position as follows:

> 7. Attorney Neuberger's argument was a continuation of his client's actions to collect a judgment against the Debtor in No. 12055–NC and therefore constituted a "willful violation" of the stay as that term is used in 11 *U.S.C.* § 362(h), entitling debtor to actual damages, including costs and attorney's fees, and punitive damages.

> 8. Vice Chancellor Jacob's decision to continue considering the pending motions, and placing on debtor the burden of proving the stay applied, also constituted a "willful violation," entitling debtor to damages, costs and fees.

(Case Doc. # 5, p. 2)

■ As noted above, the contempt motions are not collection actions against Debtor. It appears that Debtor is arguing that since the Chancery Court case is an action against Debtor, any consideration of, or decision on, the non-applicability of the stay order to any proceeding arising out of that action constitutes a continuation of the action against Debtor and therefore is a violation of the stay order.

■ The Debtor has not cited any authority, and I find no such authority, for the proposition that when a bankruptcy petition is filed the parties to an action pending in a non-bankruptcy court and the presiding judicial officer of that non-bankruptcy court are deemed to violate the stay order by consider-

ing and deciding the applicability of the stay order to the non-bankruptcy court proceeding. Indeed, all the reported authority on the issue is to the contrary.

The observation of the court in *Picco v. Global Marine Drilling Co.,* 900 F.2d 846, 850 (5th Cir.1990), is squarely on point:

> The automatic stay of bankruptcy court does not divest all other courts of jurisdiction to hear every claim that is in any way related to the bankruptcy proceeding.... [O]ther district courts retain jurisdiction to determine the applicability of the stay to litigation pending before them, and to enter orders not inconsistent with the terms of the stay.

The Court in *In re Baldwin–United Corp. Litigation,* 765 F.2d 343, 347 (2d Cir.1985), found that a district court in New York had jurisdiction to determine the scope of the automatic stay of a bankruptcy court in Ohio and similarly concluded:

> Whether the stay applies to litigation otherwise within the jurisdiction of a district court or court of appeals is an issue of law within the competence of both the court within which the litigation is pending ... and the bankruptcy court supervising the reorganization.

In *In re Chateaugay Corp., Reomar, Inc.,* 93 B.R. 26, 30 (S.D.N.Y.1988), the court likewise ruled that it was within the competence of both the bankruptcy court and the non-bankruptcy court to decide the applicability of the stay order:

> Under 11 U.S.C. § 362(d), a motion to *modify* or *lift* the provisions of the automatic stay with respect to a particular action must be made to the bankruptcy court which is supervising the reorganization.... In contrast, the issue of the *applicability* of the automatic stay to the litigation in question is within the competence of both courts—the court in which *the litigation is pending,* ... and *the bankruptcy court supervising the reorganization.*

Other federal and state courts have ruled to the same effect. *Hunt v. Bankers Trust Co.,* 799 F.2d 1060, 1069 (5th Cir.1986) (finding that district court and federal appeals court

had jurisdiction to determine applicability of stay to case pending before district court, as well as affect of stay on order forbidding filing bankruptcy anywhere else); *N.L.R.B. v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 938–39 (6th Cir.1986) (finding that court of appeals in which stayed litigation is pending has jurisdiction to decide not only its own jurisdiction but also the issue whether stay even applies); *Westlund v. State, Dept. of Licensing*, 55 Wash.App. 82, 778 P.2d 40 (1989), rev. denied, 113 Wash.2d 1020, 781 P.2d 1322 (1989) (court is empowered to determine whether or not the proceeding to revoke the debtor's license is subject to the automatic stay provision).

 In concluding that the automatic stay order did not apply to the contempt motions against parties other than Debtor, the Chancery Court was exercising its inherent authority to make determinations of matters properly before it. The cases cited above make it abundantly clear that it is not the intent of Code § 362(a) to override that authority. If an aggrieved party believes that the state court determination is wrong, it can seek relief in the bankruptcy court where the stay order emanated. In this regard, I view the Vice Chancellor's comment as to how he intended to proceed "absent a contrary directive from the Bankruptcy Court" as an acknowledgment of that relief avenue.

 Since a non-bankruptcy court has the right to consider whether the automatic stay order applies to matters before it, it logically follows that the parties before that court have the right, indeed perhaps the duty, to express to that court their views on whether the stay order applies to such matters. Absent bad faith conduct, the exercise of that right by the parties before the non-bankruptcy court cannot constitute a violation of the stay order. The record does not evince any such bad faith conduct.

 Even if the Mother Church and its counsel and the Vice Chancellor came to the wrong conclusion (which in my view they did not) regarding the non-applicability of the automatic stay to the contempt proceeding against parties other than Debtor, there is an additional reason for not finding a willful violation. In *In re Atlantic Business & Community Corp.*, 901 F.2d 325 (3d Cir. 1990), this Circuit adopted a strict objective standard for determining whether a willful violation has occurred.

A 'willful violation' does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded.

*Id.* at 329.

However, in *University Medical Center v. Sullivan*, 973 F.2d 1065 (3d Cir.1992), the court retreated from that strict interpretation. In *University Medical Center*, the Department of Health and Human Services set off post-petition payment obligations to the debtor hospital against pre-petition claims which it had against the hospital. The Department cited provisions of the Medicare statute which it believed overrode the provisions of Code § 362(a). The court disagreed, finding that the post-petition set-offs violated Code § 362(a). However, because the Department exercised a good faith belief based on persuasive legal authority, the court concluded that the violation was not willful as contemplated by Code § 362(h):

Here, however, the actions of the Secretary were neither in defiance of a court order nor were they contrary to certain contemporaneous interpretations of sections 362 and 365. The Secretary believed in "good faith" that he was not violating the stay. This of course is not sufficient under *Atlantic Business* to escape liability under section 362(h). However, the Secretary also had persuasive legal authority which supported his position.

*Id.* at 1088.

\* \* \* \* \* \*

We find that the Secretary was justified in standing firm in his position and in litigating these issues vigorously. We conclude, therefore, that the actions of the Secre-

tary, taken in reliance on statutory direction and case law support, were not "willful" as we have defined that term in section 362(h) or in our explication of it in *Atlantic Business.*

*Id.,* at 1089.

Not only did the Mother Church and Chancery Court have persuasive legal authority for their position, in the opinion of this Court, the Mother Church's and the Chancery Court's view of the law was clearly a correct one. Indeed, had Chancery Court decided that it could proceed to consider the action instituted by the Conference in Sussex County in May 1994, it would, in my view, have been correct on that score also. *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel,* 682 F.2d 446, 448 (3d Cir.1982) ("Section 362 by its terms only stays proceedings *against* the debtor. The statute does not address actions brought *by* the debtor which would enure to the benefit of the bankruptcy estate.").

 As to the Vice Chancellor's actions, there is still a further basis for rejecting the two contempt motions. The Vice Chancellor is entitled to judicial immunity when acting on matters within his jurisdiction, which he clearly was in this situation. *See Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967); *Stump v. Sparkman,* 435 U.S. 349, 356, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978): *Mireles v. Waco,* 502 U.S. 9, 11–12, 112 S.Ct. 286, 287–88, 116 L.Ed.2d 9 (1991).

For the foregoing reasons, both Debtor's Contempt Motion and Rev. Jackson's Contempt Motion are denied.

*Mother Church's Lift Stay Motion; Debtor's and Jackson's Enforcement Motions*

Pursuant to Code § 362(d), the Mother Church seeks relief from the automatic stay order to allow the proceedings involving Debtor to continue in both the Chancery Court and the Delaware Supreme Court.[4] The Mother Church argues that the Chapter 7 petition was filed for the purpose of frustrating the relief which it was in the process of obtaining in the Chancery Court and in the Supreme Court. According to the Mother Church, Debtor's filing was made in bad faith and such conduct is "cause" under Code § 362(d)(1) for lifting the stay order.

Debtor's Enforcement Motion seeks "an order of the Court directing Vice Chancellor Jacobs to cease further proceedings in No. 12055–NC and No. 1674–S." (Case Doc. # 4, p. 2) The motion asserts that because Debtor is statutorily and contractually bound to indemnify the non-Debtor respondents to the Chancery Court proceedings those proceedings are effectively proceedings against Debtor and "the debtor is in need of immediate relief from those continuing claims." (Case Doc. # 4, p. 2)

Rev. Jackson's Enforcement Motion likewise seeks "an order of the Court directing Vice Chancellor Jacobs to cease all proceedings in No. 12055–NC and No. 1674–S." (Case Doc. # 8, p. 5) According to Rev. Jackson, this Court should enjoin the Chancery Court proceedings against him because the ultimate target of the proceedings is Debtor and because Rev. Jackson has indemnification rights against Debtor but Debtor has no assets. Furthermore, according to Rev. Jackson, a Chancery Court proceeding against him, in Debtor's absence, could produce a result inconsistent with the result in subsequent proceeding against Debtor. Finally, Rev. Jackson argues that a proceeding against him is effectively a proceeding against Debtor.

Debtor's and Jackson's enforcement motions present the same issue as the Mother Church's lift stay motion, namely, in what forum and when should the claims of Mother Church versus those of the Conference and its agents be determined? For the reasons set forth below, I conclude that the forum should not be this Court and there is no reason to delay the proceedings in other courts.

---

4. Code § 362(d)(1) provides:
 (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
 (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

Filing bankruptcy in bad faith is "cause" for relief under Code § 362(d)(1). *In re Dixie Broadcasting, Inc.,* 871 F.2d 1023, 1027 (11th Cir.1989), *cert. denied* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989). Also, the existence of a more appropriate forum than the bankruptcy court is "cause" for relief under Code § 362(d)(1). *In re Hohol,* 141 B.R. 293 (M.D.Pa.1992); *In re Drexel Lambert Group, Inc.,* 113 B.R. 830 (S.D.N.Y.1990); *In re Makarewicz,* 121 B.R. 262, 265 (S.D.Fla.1990).

That the petition was filed on the eve of the date for the Delaware Supreme Court's issuance of its mandate, following its March 3, 1995 order affirming the Chancery Court decisions, strongly suggests that the petition was filed with the intent of delaying, if not supplant, the state court proceedings which commenced in 1991. The Conference has effectively acknowledged as much. In her March 24, 1995 letter to the Vice Chancellor regarding the effect of the stay order, Ms. Shearin, in urging the Chancery Court to do nothing, suggested that by time the stay order is lifted "the Bankruptcy Court will have resolved the financial issues between the parties, and that will leave many of the other issues either moot or *res judicata.*" (Adv.Doc. # 9, p. 5) At the hearing Ms. Shearin suggested that this Court should "sort out" the matter before the state courts as to who is entitled to the $11,000 supersedeas deposit.

This filing is similar to a tactic employed by the Debtor in 1991. Following the issuance by the Chancery Court of a temporary restraining order against the Conference in April 1991, the Conference, through a surrogate, commenced an action against the Mother Church in the District Court for the District of Delaware. The District Court had little difficulty in recognizing that tactic as an attempt to frustrate the jurisdiction of the Chancery Court and dismissed the action under the federal abstention doctrine articulated by the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Absent the tactic of frustrating or supplanting the state court proceedings, a bona fide reason for the filing is not discernable. Clearly, the petition filing makes no sense in terms of bankruptcy law policy. The petition is a filing under Chapter 7, not Chapter 11. This petitioner is not attempting to reorganize and seek accommodations from its creditors, thereby enabling it to continue to operate. Rather, the objective of a Chapter 7 case is to cause the appointment of an independent trustee to marshal and liquidate the assets of the estate for pro rata distribution among the classes of creditors. It is designed to promote equal treatment among classes of creditors versus the result produced outside of a bankruptcy when creditors who are swifter and more aggressive in their collection efforts benefit at the expense of the other creditors.

However, Debtor's schedules, its pleadings and its counsel's statements at the hearing show that there is really very little by way of estate assets to protect for the benefit of an equitable distribution to unsecured creditors. According to the schedules, Debtor has assets aggregating $298,850 versus liabilities aggregating $9,413,296. It turns out that the $298,850 asset figure is a bogus figure. That figure, according to the schedules, consists of: (1) cash deposit held by the Chancery Court—$11,000; (2) office equipment—$500; (3) a line of credit from the Peter Spencer Historical Society ("the Society")—$272,000; (4) funds held by the Superior Court for condemnation of property—$4,350; (5) funds held by the Chancery Court for supersedeas on appeal—$11,000. At the hearing Debtor's counsel adjusted the $298,850 asset value figure downward as follows: [5]

(1) In the schedules the $11,000 deposit held by the Chancery Court was counted twice.

(2) The $272,000 line of credit is not an asset at all. That number reflects funds advanced by the Society to the Conference

---

**5.** While the petition and schedules show Edith H. Hull–Johnson as counsel for Debtor, at the hearing Debtor was represented by K. Kay Shearin.

According to Ms. Shearin, she and Rev. Jackson provided the information to Ms. Hull–Johnson to fill out the petition and schedules forms.

over the course of a number of years. Thus, the $272,000 figure is a claim against Debtor.

(3) The $4,350 of condemnation funds held by the Superior Court are funds which, when and if disbursed, will be paid to the Conference as trustee for one of its affiliated churches. The affiliated church is the beneficiary of the fund. Thus, the $4,350 is not an asset of this estate.

(4) As to the $11,000 deposit with the Chancery Court, Debtor asserts that these funds, if and when released to it by the Chancery Court, will be turned over to either Rev. Jackson or the Society, or both, because, according to Debtor, Rev. Jackson and the Society are secured creditors of Debtor and the collateral which secures their claims is the $11,000 deposit.

The Mother Church disputes Debtor's position that the $11,000 deposit is property of the estate or that it is collateral for the claims of Rev. Jackson and the Society. The Mother Church asserts that because the funds were posted by Rev. Jackson to protect his property from judgment execution, given the Supreme Court's affirmance of the judgment, that deposit serves to satisfy the judgment. The Conference has filed a motion for reconsideration with the Supreme Court, and if successful, presumably the Mother Church's claim to the funds could be denied.

If the Debtor's theory is correct, then the $11,000 Chancery Court deposit will go to Rev. Jackson and/or the Society. If the Mother Church is correct, the funds will go to it. In either event, the value of Debtor's assets will have been reduced to $500.

When asked at the hearing whether it made any sense to file a Chapter 7 case so that $9,413,296 of claims can look to $500 of assets for satisfaction, Debtor's counsel responded that the claims figure was not really $9,413,296—but a much smaller figure. According to Debtor's counsel, the $9,413,296 resulted from an attempt to fully disclose Debtor's potential exposure. When pressed to give a realistic liability figure, Debtor's counsel stated that the aggregate amount of

claims listed in the schedules is more like approximately $100,000. Adding this to the newly disclosed $272,000 claim of the Society produces a claims figure of $372,000. Thus, the aggregate claims figure of $9,413,296 in Debtor's schedules was also a bogus number. However, it still remains that, according to Debtor's theory, there are only $500 of assets to satisfy those claims. Ignoring the costs of administering the estate (including trustee's fees, counsel fees and converting office equipment to cash), it is clear that the potential benefit to the unsecured creditors of this Chapter 7 estate is minute at best. Viewed in that light, and because Code § 727(a)(1) [6] does not permit a corporation to obtain a discharge in a Chapter 7 case, I find that the petition filing serves no bankruptcy law purpose.

In its Response to Motion For Relief From Automatic Stay (Adv.Doc. # 6), Debtor unequivocally states reasons for the petition filing which are not founded in bankruptcy law policy. At the hearing Debtor's counsel confirmed these reasons. There are two:

(1) "Debtor began this proceeding to prove to Delaware's Supreme Court, before it decides Debtor's motion for reconsideration, that Debtor did not pay the judgment in No. 12055–NC because it had no assets, so the Bishop was not at fault for the failure." (Adv.Doc. # 6, p. 3)

(2) "[T]he simple truth [is] that Debtor filed this proceeding to keep the $11,000 from being paid to [the Mother Church], an unsecured creditor, when the Bishop and/or the Spencer Society has secured claims for it." (Adv.Doc. # 6, p. 5)

At the hearing Debtor's counsel expounded on these two reasons for the filing. According to Debtor, since it has thus far been unable to convince the state courts that Debtor has no assets, it concluded that a way to do that is to have the independent trustee in this Chapter 7 case examine Debtor's affairs and thereby presumably convince the state courts that Debtor has no assets. Given the many occasions where the state courts

---

**6.** Code § 727(a)(1) provides:
 (a) The court shall grant the debtor a discharge, unless—

 (1) the debtor is not an individual.

have been called upon to address the positions of the Conference and the Mother Church in this tangled legal saga, I find it inconceivable that Debtor has not had a fair opportunity to present its positions. But more to the point, I find bizarre the proposition that the federal bankruptcy law should be invoked to have a federal court be the mechanism for convincing a state court of a fact being promoted by a party before that state court. No bankruptcy law policy is promoted by that proposition and I conclude that it is not a proper reason for filing a petition.

I turn now to the second stated reason for the filing. Although perhaps not bizarre, it is anomalous. A dispute exists as to who is entitled to the $11,000 cash deposit with the Chancery Court. According to Debtor, because Rev. Jackson and/or the Society have secured claims to it, the filing was made to protect those claims vis-a-vis the Mother Church. Rev. Jackson and the Society have filed separate proofs of claims. Both claims were filed by Ms. Shearin who is shown on the documents as attorney for the claimants.[7] Rev. Jackson's proof of claim states that he is a secured creditor to the extent of $11,000 and the evidence of that security interest is an indemnification provision of the Delaware General Corporation Law, 8 *Del.C.* § 145(c).[8] According to the Society, it has a secured claim because the $11,000 check which Ms. Hull–Johnson delivered to the Supreme Court on October 21, 1994 as a supersedeas deposit came from funds which the Society turned over to Ms. Hull–Johnson. There is no written security agreement between Debtor and Rev. Jackson or between Debtor and the Society, but Debtor constructs a U.C.C. Article 9 argument in support of the claims. I find that argument confusing and unconvincing. But for purposes of the motions

before me, I need not decide whether Rev. Jackson and/or the Society are secured creditors with respect to the $11,000 deposit.

Assuming that Rev. Jackson and/or the Society are secured creditors of Debtor and the collateral for those security interests is the $11,000 deposit, the filing of the bankruptcy petition does not advance their cause. Absent specific bankruptcy court authorization for creating post-petition security interests in situations not applicable here,[9] a bankruptcy filing does not create or enlarge creditor security interests. Security interests in a debtor's property are determined by state law arising out of pre-petition transactions. *Decatur Contracting v. Belin, Belin & Naddeo*, 898 F.2d 339, 342 (3rd Cir.1990) ("The court must look to [state] law to determine what, if any, property interest the parties hold in the debtor's estate."). In other words, whatever security interests Rev. Jackson and/or the Society have, they had them the day before the petition was filed and they were not created, enlarged or enhanced by the filing of the petition, nor will they be created, enlarged or enhanced by any subsequent proceedings arising out of the filing. Consequently, neither Rev. Jackson nor the Society gain anything by the filing of the bankruptcy petition. If either or both of them are secured creditors with respect to the $11,000 deposit, their non-bankruptcy law created rights will be respected in the state court to the same extent as in this Court. Of course, whether their claims to the $11,000 deposit are superior to the interest of the Mother Church in the deposit is a matter for determination pursuant to state law. Thus, I conclude that Debtor's second stated reason for the filing makes no sense in the context of bankruptcy law. No bankruptcy law policy is promoted by a filing made for the reasons put forth by Debtor.

---

**7.** Ms. Shearin offered no explanation as to why it is not a conflict of interest to be representing both Debtor and its two purported secured creditors at the same time.

**8.** Section 145(c) provides:

(c) To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or

in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

**9.** For example, pursuant to Code § 364(c), the court can grant a security interest in estate property to a post-petition lender, and, pursuant to Code § 361, "adequate protection" to a secured creditor may be provided in the form of an additional or replacement lien.

As noted above, earlier in the history of the long running dispute between the Conference and the Mother Church, the Conference attempted to circumvent the jurisdiction of the Chancery Court by trying to bring the dispute into the federal forum. In its memorandum opinion of March 24, 1992, the District Court dismissed that action under the *Younger* abstention doctrine, finding that the three requirements for the application of the *Younger* abstention doctrine had been met: (1) there was a state court proceeding occurring at the same time as the newly instituted federal cause of action and the federal court proceeding was effectively intended to reverse the state courts decisions up to that point, (2) deciding the issue raised by the federal court plaintiff would require the District Court to apply state property law, an area which is properly left to the state's discretion, and (3) the state court proceeding provided adequate means in which the federal court plaintiff could raise constitutional issues. The reasoning of the District Court in 1992 is equally, if not more, compelling today.

 A brief look at a bankruptcy court's jurisdiction is appropriate. In enacting the Bankruptcy Reform Act of 1978, Congress intended to grant bankruptcy courts broad jurisdiction to bring together all civil proceedings concerning the bankruptcy estate. Report Of The Commission On The Bankruptcy Laws Of The United States, H.R.DOC. NO. 137, 93d Cong., 1st Sess. 85, 90 (1973), *reprinted in* 2 APP. Collier on Bankruptcy (Lawrence P. King ed., 15th ed. 1989); *see NLT Computer Servs. Corp. v. Capital Computer Sys., Inc.,* 755 F.2d 1253, 1260 (6th Cir.1985). Congress also recognized that the bankruptcy systems' expansive jurisdiction created the potential to bring into federal courts matters best left to state courts to decide. H.R.Rep. No. 595, 95th Cong., 1st Sess. 51 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6012. The framework for this expansive jurisdiction with clearly defined abstention directives is set forth in 28 U.S.C. § 1334. Pursuant to

§ 1334(a), the Bankruptcy Court, as a unit of the District Court, has original and exclusive jurisdiction of all cases under Title 11; and pursuant to § 1334(b), the Bankruptcy Court, as a unit of the District Court, has original but not exclusive jurisdiction of all civil proceedings arising under Title 11 or arising in or related to cases under Title 11. The proceedings in the Delaware state courts are civil proceedings related to this Title 11 case as contemplated by § 1334(b). For bankruptcy proceedings the *Younger* doctrine is codified in § 1334(c)(1) and (2)—one a discretionary and the other a mandatory abstention directive:

Subsection (c)(1) provides:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

Subsection (c)(2) provides:

Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

Debtor and Rev. Jackson have asked this Court to stay the state court proceedings involving them. However, they do not indicate how such a stay would promote the goals of this Chapter 7 case. Presumably, at some point Debtor will ask this court to undertake a determination of issues which arise out of or are related to the state court proceedings and which are appropriate for decision by those courts.[10] In that event, I can perceive of no reason why this Court would not abstain pursuant to 28 U.S.C.

---

**10.** As noted above, Debtor has already asked this Court to "sort out" the rights to the $11,000

supersedeas deposit.

§ 1334(c)(1) and (2). Pursuant to Code § 704(1), the Chapter 7 trustee is to "collect and reduce to money the property of the estate ... and close such estate as expeditiously as is compatible with the best interests of parties in interest." It seems to me that the most effective way to do that, as it relates to Debtor's claims vis-a-vis those of the Mother Church, is to permit the state courts to conclude the business which was commenced in the Chancery Court in 1991.

By C.A. No. 1674, Debtor seeks specific performance of an alleged written contract whereby the Mother Church promised to convey its real estate to the Conference upon secession by the Mother Church from the conference. At the hearing, Debtor stated that that action has merit and Debtor specifically requested authorization to pursue that action.[11] Given my view of Code § 362(a) as discussed above, prosecution of that action by Debtor is not stayed. The only question is whether and under what circumstances the trustee would deem it appropriate to pursue the action. Be that as it may, it seems to me that the second Chancery Court action clearly raises the matter of issue preclusion arising out of the first Chancery Court action. Indeed, in the first action the Mother Church has already sought to enjoin the Conference from pursuing the second action on the grounds that it is precluded from doing so by determinations already made by the Chancery Court in the first action. Given this obvious link between the two actions, if prosecution of the second is to continue, it is demonstrably clear that prosecution of the first should also continue.

Because I find no useful purpose is served in this Chapter 7 case by delaying the state court proceedings involving the disputed claims between Debtor and the Mother Church, I would be disposed to grant the motion of Mother Church to lift the stay to permit all the Delaware state court proceedings involving it and its agents and Debtor and its agents to continue, and to deny Debtor's and Rev. Jackson's enforcement motions. However, I find the circumstances here justify broader measures.

A bankruptcy court as a court of equity has the inherent power to dismiss a case when its jurisdiction has been improperly invoked.[12] In *Matter of Century City, Inc.*, 8 B.R. 25, 29 (D.N.J.1980), the court cited the ample authority for this proposition:

[U]nder its inherent power the Court may act *sua sponte* to dismiss, independently of the grounds specified in either § 305[a] or § 1112[b] of the Code. *See Banque de Financement v. First Nat'l Bank of Boston*, 568 F.2d 911, 916 n. 8 (2d Cir.1977); *In re Ettinger*, 76 F.2d 741 (2d Cir.1935); *In re Pioneer Warehouse Corp.*, 2 B.R. 1, 9 (Bkrtcy.E.D.N.Y.1979). The power of the Court to dismiss a case when its jurisdiction has been improperly invoked is inherent in the bankruptcy court as a court of equity, guided by equitable doctrines and principles; *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 435, 60 S.Ct. 1044, 1046, 84 L.Ed. 1293 (1941). *See also Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). "There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction;" *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1965). *See In re St. Matthew Lutheran Church*, 6 Bankr.Ct.Dec. 578 (Bkrtcy. C.D.Cal.1980), wherein the court expressly based its decision to dismiss a Chapter 11 case, not on 11 U.S.C. § 305[a], but rather on its inherent power to dismiss a case which imposed upon its jurisdiction.

---

11. Such request, of course, is inconsistent with the relief requested by Debtor's Enforcement Motion which sought a stay of all matters related to both Chancery Court cases. (Case Doc. # 4, p. 2)

12. In addition to this inherent power, there are specific Code provisions allowing dismissal of chapter cases. Code § 305(a)(1) provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension." Some authorities believe that Code § 305(a)(1) is to be narrowly construed and may only be applicable to involuntary cases. *See, e.g., In re Pine Lake Village Apartment Co.*, 16 B.R. 750 (Bankr. S.D.N.Y.1982). Not relevant here are the specific causes spelled out in Code § 1112(b) for dismissing a Chapter 11 case.

Citing numerous cases in support, the court in *Matter of Coastal Nursing Center, Inc.*, 164 B.R. 788, 793 (Bankr.S.D.Ga.1993), found that:

> [C]ourts which have considered whether [a good faith] requirement still exists have uniformly held that a bankruptcy court, sitting as a court of equity, possesses the inherent power to determine whether a debtor has improperly invoked its jurisdiction by coming into the court in bad faith. (citations omitted.)

And in *Pleasant Pointe Apts. v. Kentucky Housing Corp.*, 139 B.R. 828, 831 (W.D.Ky. 1992), the court found that when Congress amended Code § 105(a) in 1986, it expressly recognized that power.

In 1986, Congress amended section 105(a) of the Bankruptcy Code and resolved the uncertainty over the construction and effect of section 1112(b) by expressly recognizing the bankruptcy courts' inherent powers to monitor and police proper use of the bankruptcy laws and mechanisms. Congress amended section 105(a) by adding the following sentence:

> No provision of this title providing for the raising of an issue by a party shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). According to this additional sentence, the fact that section 1112(b) requires a party or trustee to request dismissal or conversion does not preclude bankruptcy courts from evaluating a Chapter 11 petition and, on its own initiative, dismissing or converting that petition for cause. *In re Clark*, 107 B.R. 376 (S.D.Fla.1988). *In re Miracle Church of God in Christ*, 119 B.R. 308 (Bankr. M.D.Fla.1990). *See also* 5 Collier on Bankruptcy 1112.03[4] (1992).

For purposes of exercising the power authorized by Code § 105(a), it makes no difference whether it is a Chapter 11 case or a Chapter 7 case.

■ I have described above in some detail why I find this case achieves no bank-ruptcy law objective and has only served to delay and frustrate legitimate state court proceedings. In summary, I find the following factors support the conclusion that this Chapter 7 filing was an abuse of the bankruptcy process:

(1) The assets and the claims figures in Debtor's schedules are bogus. According to Debtor, it has available assets, at best, of only $500, versus claims of approximately $372,000. Based on his examination of Debtor's affairs, the trustee stated at the hearing that he views this as a "no asset" case. There are no meaningful creditor interests protected by this case and since Debtor is a corporation it cannot obtain the benefit of a discharge in this Chapter 7 case.

(2) Debtor is represented by counsel who represents the only alleged secured creditors. If those two creditors have security interests, those interests arise solely out of state law and are not enhanced or enlarged by bankruptcy law.

(3) This Chapter 7 filing is the latest tactical maneuver by Debtor in a four-year struggle with its principal adversary involving purely state law issues properly considered in state court proceedings.

(4) Debtor's counsel has made it clear that the petition filing is intended to render moot, or dispose of by *res judicata*, state law issues which have been properly and extensively considered by state courts over a number of years.

(5) Debtor has expressed two reasons for filing this Chapter 7 case which are not consonant with bankruptcy law policy, namely,

(a) to try to convince a state court as to a factual contention being made by Debtor in that court, and

(b) to establish a proposition regarding security interests in Debtor's property which cannot be established by a Chapter 7 filing.

I find that this Chapter 7 case serves no cognizable bankruptcy law purpose, but, rather, is an obvious attempt to circumvent and frustrate the disposition of state law

remedies in state law tribunals and, accordingly, I dismiss the case.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, Debtor's contempt motion (Case Doc. # 5) and Rev. Jackson's contempt motion (Doc. # 7) are denied, and this Chapter 7 case is dismissed.