## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SEHOY ENERGY LP, and DEAN KETCHAM, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) C.A. No. 12387-VCG ) |
| HAVEN REAL ESTATE GROUP, LLC, HAVEN CHICAGO LP, and ALBERT ADRIANI, | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| HAVEN REAL ESTATE FOCUS FUND, LP, | ) ) ) |
| Nominal Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted: January 25, 2017
Date Decided: April 17, 2017

John P. DiTomo and Lauren K. Neal, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Natalie D. Ramsey and Lisa Zwally Brown, of MONTGOMERY MCCRACKEN WALKER & RHOADS, LLP, Wilmington, Delaware, *Attorneys for Defendants Haven Real Estate Group, LLC and Albert Adriani*.

David A. White and Hayley J. Reese, of McCARTER & ENGLISH, LLP, Wilmington, Delaware; OF COUNSEL: Ellen C. Brotman, of GRIESING LAW, LLC, Philadelphia, Pennsylvania, *Attorneys for Defendant Haven Chicago LP and Nominal Defendant Haven Real Estate Focus Fund, LP*.

GLASSCOCK, Vice Chancellor

This matter involves a suit by investors in a partnership. They allege that the general partner, and its principal, falsely induced their entry into the partnership, breached the partnership agreement by denying them access to records and preventing their exit from the entity, and breached contractual and fiduciary duties by making investment decisions based on self-interest, decisions which had a devastating effect on the partnership. The investors brought suit against the general partner, the controller and an affiliate.

Thereafter, the partnership (and the Defendant affiliate) filed for bankruptcy. The Plaintiffs filed the instant motion; in effect, a prophylactic motion seeking a determination that the resulting bankruptcy stay does not apply to their claims against the general partner—Haven Real Estate Group—or its controller, Albert Adriani. The partnership itself is not a defendant here, they note, and thus the automatic stay of actions against the debtor-in-bankruptcy does not apply. The Defendants argue that all claims are, or should be, stayed.

A cause of action brought on behalf of an entity is an asset of that entity. Like any other asset of an entity entering bankruptcy, the cause of action passes to the bankruptcy trustee, to be deployed on behalf of the bankruptcy estate and its beneficiaries. To the extent, therefore, that Plaintiffs' claims in this action are in fact derivative claims belonging to the partnership, their consideration here must be stayed pending resolution of the matter in bankruptcy. To the extent, however, that

1

the Plaintiffs have brought direct claims against non-bankrupt Defendants, those claims belong to the Plaintiffs themselves. Such claims are not a part of the estate in bankruptcy, and thus may proceed despite the bankruptcy. In other words, I must examine the causes of action in the complaint, and determine if they are derivative of the partnership, and stayed; or direct, and free to proceed. I find the Plaintiffs' claims largely direct in nature: my reasoning follows.

## I. BACKGROUND

### A. *The Parties and Relevant Non-parties*

The following facts are drawn from the Amended Complaint and adopted for purposes of this motion only.[1] Plaintiff Sehoy Energy LP is a Delaware limited partnership with its principal place of business located in Seattle, Washington. Plaintiff Dean Ketcham is an individual residing in Brownfield, Maine.[2]

Nominal Defendant Haven Real Estate Focus Fund LP (the "Partnership") is a Delaware limited partnership formed pursuant to the Delaware Revised Uniform Limited Partnership Act. The Partnership's registered office is in Bethany Beach, Delaware. Defendant Albert Adriani founded the Partnership.[3]

---

[1] The facts are drawn from the Plaintiffs' Verified Amended Complaint (the "Complaint" or the "Compl.") and the exhibits thereto.

[2] Compl. ¶¶ 6–7.

[3] *Id*. at ¶¶ 8, 11.

Defendant Haven Real Estate Group, LLC (the "General Partner") is an Illinois limited liability company with its principal place of business located in Clarendon Hills, Illinois. The General Partner is general partner of the Partnership and is a shell entity controlled by Defendant Albert Adriani, who serves as its managing member.[4]

Defendant Haven Chicago, LP ("Haven Chicago") is a Delaware limited partnership formed pursuant to the Delaware Revised Uniform Limited Partnership Act. Haven Chicago's registered office is in Bethany Beach, Delaware. Haven Chicago is a shell entity controlled by Defendant Albert Adriani and used by Adriani to invest his own money in real estate and private notes.[5] Adriani is the managing member of the General Partner and is the Partnership's founder.[6] Nonparty Kazi Hassan is a friend of Adriani, and is the principal of SK Capital Investment,[7] an entity to which the Partnership made loans that are now the subject of this litigation.

*B. The Structure of the Partnership*

Adriani formed the Partnership on June 1, 2011.[8] According to Section 1.03 of the Limited Partnership Agreement (the "LPA"), the purpose of the Partnership is to "serve as a fund through which the assets of its Partners may be utilized for the

---

[4] *Id.* at ¶¶ 9, 11.
[5] *Id.* at ¶ 10.
[6] *Id.* at ¶ 11.
[7] Compl. Ex. J; *id.* at Ex. Q.
[8] *Id.* at ¶ 13.

purpose of active and speculative trading in publicly traded real estate securities listed on the U.S. stock exchanges."[9]

Section 3.01 of the LPA provides that the power to manage the business and affairs of the Partnership, including the "authority to select investments," is vested exclusively with the General Partner.[10] That section goes on to require that the General Partner "shall invest the funds" as it deems appropriate "in accordance with the purposes set forth in Section 1.03."[11] In solicitation of investors in the Partnership, Adriani circulated a Confidential Private Placement Memorandum of the Partnership (the "PPM") to potential purchasers.[12] The PPM discloses that Defendant Adriani is the "managing member and controlling person of the General Partner" and "controls all of the Partnership's operations and activities."[13]

The limited partners' interests in the Partnership are "not freely transferable" due to the lack of a market.[14] The limited partners' interests are not registered under federal or state securities laws.[15] Consequently, the only way that the limited partners may redeem or liquidate their interests is by withdrawal from the Partnership in accordance with the LPA.[16] Section 7.02 of the LPA prescribes the

---

[9] LPA § 1.03.
[10] Compl. ¶ 14; LPA § 3.01.
[11] Compl. ¶ 15; LPA § 3.01.
[12] Compl. ¶ 16.
[13] *Id.* ¶ 14; *id.* at Ex. A (the "Private Placement Memorandum" or "PPM") at 4.
[14] Compl. ¶ 25; PPM at 41.
[15] *Id.*
[16] PPM at 41.

parameters applicable to such a withdrawal, including the minimum amount, the written notice to the General Partner, and the payment schedules.[17]

The LPA provides that limited partners are entitled to "inspect and copy the Partnership's books and records upon prior written notice," and that, after the end of each fiscal year, the General Partner "shall cause to be prepared and distributed to each Partner" an audited annual financial statement prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[18]

*C. Events Leading to this Litigation*

In January 2013, Adriani and the Plaintiffs began discussions about a potential investment in the Partnership.[19] During those meetings, Adriani distributed a "pitch book" to the Plaintiffs (the "Pitch Book").[20] The Pitch Book explained that the Partnership's philosophy was to invest "opportunistically across all areas of the real estate securities universe."[21] The Pitch Book further disclosed that the maximum position size taken by the Partnership was "25% of the portfolio" and the maximum liquidity of any of the [Partnership]'s positions was "3 days' average volume."[22] The

---

[17] Compl. ¶¶ 26–27; LPA § 7.02.
[18] Compl. ¶¶ 28–29; LPA §§ 3.07(a)–(b), 5.04.
[19] Compl. ¶ 30.
[20] *Id.*
[21] *Id.* at ¶ 30; *id.* at Ex. C (the "Pitch Book") at 5.
[22] *Id.* at ¶ 31; Pitch Book at 8.

discussions continued from January to March, 2013, during which Adriani also delivered the PPM and LPA to the Plaintiffs.[23]

On April 14, 2013, as part of the negotiation, Adriani executed an addendum to the LPA (the "Addendum") to make it easier for the Plaintiffs to withdraw their investment if they chose to exercise that right.[24] On or about April 30, 2013, the Plaintiffs invested approximately $1.6 million in the Partnership.[25] The Plaintiffs entered into a subscription agreement in connection with their investment.[26]

From the date of their investment, the Plaintiffs received "regular e-mail communications regarding the Partnership's performance" from Adriani.[27] In one e-mail dated June 10, 2013, Adriani disclosed the Partnership's investments in certain "publicly traded real estate securities."[28] In another e-mail dated April 7, 2014, Adriani stated that the Partnership was "up more than 7% year to date."[29] Adriani also issued financial statements that showed the net returns to the Plaintiffs year-to-date.[30] The Plaintiffs now contend that these disclosures were false and misleading.[31]

---

[23] Compl. ¶ 32.
[24] *Id.* at ¶ 33.
[25] *Id.* at ¶ 34.
[26] *Id.*
[27] *Id.* at ¶ 36.
[28] *Id.* at ¶ 37.
[29] *Id.* at ¶ 41; *id.* at Ex. I.
[30] *Id.* at ¶ 39.
[31] *See id.* at ¶¶ 38–40.

The Plaintiffs began noticing problems with the Partnership following the receipt of their 2013 K-1s.[32] In response to the Plaintiffs' inquiry about their interest income, Adriani explained that he had made "a lot of hard money loans in the portfolio last year."[33] Adriani further disclosed he made the loans to SK Capital Investment, an entity owned by Kazi Hassan who Adriani identified as "a gentleman I have known for over [ten] years."[34] He also represented that the outstanding loans were $3.7 million "secured and cross collateralized by three [of Hassan's] restaurants"[35] and that the Partnership had "the senior position, with the exception of" one restaurant which was subject to a first mortgage.[36] In July 2014, the Plaintiffs demanded that Adriani "get Plaintiffs' money out of the loans to Hassan as soon as possible," which Adriani agreed to do.[37] On August 2, 2014, Adriani circulated an e-mail stating that the "loan portfolio has shrunk by more than expected to $2.6 million."[38] One month later, Adriani disclosed that "an additional $500k" of the loan balance was paid down and the Partnership was up "about 17.25% for the year to date."[39]

---

[32] *See id*. at ¶ 42.

[33] Compl. ¶ 42; *id.* at Ex. J.

[34] *Id.* at ¶ 45; *id.* at Ex. J.

[35] *Id.*

[36] *Id.* at ¶ 49, *id.* at Ex. K.

[37] *Id.* at ¶ 46.

[38] *Id.* at ¶ 50; *id.* at Ex. L.

[39] *Id.* at ¶¶ 50–51; *id.* at Ex. M.

7

In 2015, the Plaintiffs continued to receive "updated financial disclosures" from Adriani that showed "a steady net gain."[40] The good news proved illusory, however. On December 16, 2015, the Plaintiffs received a letter from Adriani regarding the "Investment Impairment" of the Partnership (the "Mea Culpa Letter").[41] In the Mea Culpa Letter, Adriani admitted that "a significant asset" of the Partnership had become "substantially impaired."[42] Adriani disclosed that "[o]ver the course of nearly [four] years, the [Partnership] loaned approximately $4.4 million" to Hassan and his business entities "primarily to fund the acquisitions and buildouts of restaurant franchises."[43] In describing the circumstances regarding these loans to Hassan, Adriani stated:

> I have known Mr. Hassan for over 10 years, and I have done business with Mr. Hassan on a multitude of projects for more than 5 years without problem until last year, including outside of the [Partnership] and through other funds. Our oldest sons are even good friends. However, based upon our discovery to date, I believe Mr. Hassan built a house of cards, including by 'acts of omission' and affirmative misstatements, to me and others. It is my opinion Mr. Hassan began to feel the pinch several years ago, and started borrowing from Peter to pay Paul, then vice versa, then moving to outright fraud, until his house collapsed. While hardly a positive, we appear to be the first to recognize the circumstances and obtain a judgment before several other creditors. Mr. Hassan and his entities were subsequently named defendants in at least three other lawsuits subsequent to our judgment.[44]

---

[40] *Id.* at ¶¶ 52–54.
[41] *Id.* at ¶ 55; *id.* at Ex. Q.
[42] *Id.*
[43] *Id.*
[44] *Id.* at Ex. Q.

Adriani further stated that following Hassan's nonpayment, he had instructed his lawyer to rewrite the loan documents to "cross-collateralize the obligations and rescheduled Mr. Hassan's payments" but Hassan refused to agree.[45] The letter identified the "major asset" owned by Hassan available for collection was "a piece of commercial real estate" subject to "two priority mortgages."[46] Adriani promised that, in addition to waiving his management fees from 2015 onwards, he would "not receive anything on [his] investments until each of the limited partners are repaid their basis in full."[47] Accordingly, Adriani also "promised to allocate any portion of recovery attributable to his personal debt 'first [] to the limited partners of the [Partnership] until they recover their basis in full.'"[48]

After receiving the Mea Culpa Letter, the Plaintiffs demanded the investor list and other books and records as well as annual audited financial statements for 2013 through 2015 pursuant to Section 5.04 of the LPA; however, Adriani never responded to this request.[49] In March 2016, the Plaintiffs learned that the only major asset available to collect against Hassan (the "Collateral") was scheduled to be sold in April 2016 and that Adriani had "secured a $1 million security interest in favor of

---

[45] *See id.* at ¶ 60; *id.* at Ex. Q.
[46] *Id.* at ¶ 60; *id.* at Ex. Q.
[47] *Id.* at ¶ 69; *id.* at Ex. Q. The Plaintiffs allege that Adriani "personally [has] an additional $1.2 million debt outside the [Partnership] owed by Mr. Hassan" that was made through the General Partner and that Adriani "made additional loans to Hassan through Haven Chicago, LP using his own personal assets." *Id.* at ¶ 57.
[48] *Id.* at ¶ 69; *id.* at Ex. Q.
[49] *Id.* at ¶ 70.

9

Haven Chicago, LP," his personal investment vehicle.[50] The Plaintiffs "subsequently learned that the sale of the property netted $986,438.74 available for distribution to [the Partnership]."[51] Contrary to Adriani's prior representations, he now contends that the Partnership is owed only $682,570.45, and proposes to allocate $183,819.76 to the General Partner and $120,048.53 to Haven Chicago.[52] This action followed.

*D. Procedural History*

The Plaintiffs filed this action on May 27, 2016, asserting eleven counts against the General Partner, Adriani and Haven Chicago.[53]

Counts I, II and VIII are breach of contract claims. Count I alleges breach of the LPA by the General Partner and Adriani in "loaning unsecured money to Hassan in violation of the LPA's purpose."[54] Count II alleges that the General Partner and Adriani breached the LPA by refusing to produce to the Plaintiffs the Partnership's audited financial statements and denying the Plaintiffs' right of inspection.[55] Count VIII alleges that the General Partner and Adriani breached the implied covenant of

---

[50] *Id.* at ¶ 71. As a reminder, Haven Chicago is a shell entity controlled by Adriani.
[51] *Id.* at ¶ 72.
[52] *Id.* at ¶ 73.
[53] All counts are asserted against Adriani and the General Partner. Counts IX and XI also include Haven Chicago as a defendant.
[54] Compl. ¶ 86.
[55] *Id.* at ¶ 93.

10

good faith and fair dealing by making "unsecured, junior loans on non-market terms" to Hassan and by not securing the loans or obtaining priority positions.[56]

Counts III through V are breach of fiduciary duty claims. Count III alleges that the General Partner and Adriani breached fiduciary duties by making "illegal loans" to Hassan.[57] Count IV alleges that the General Partner and Adriani breached fiduciary duties by "disclosing false and misleading statements regarding the [Partnership]'s performance and the [Partnership]'s exposure to unsecured loans with no priority" so as to avoid the Plaintiffs' exercise of their right to withdraw.[58] Count V alleges that the General Partner and Adriani breached their fiduciary duties by unfairly allocating sale proceeds from the sale of the Collateral.[59]

Counts VI and VII are fraud claims. Count VI alleges fraud against the General Partner and Adriani for knowingly making "false and materially misleading statements" regarding the Partnership's performance and the loans to Hassan, in reliance on which the Plaintiffs forwent their rights to withdraw from the Partnership or enjoin the loans.[60] Count VII alleges fraud in the inducement against the General Partner and Adriani in the concealing of Adriani's true intent to loan Partnership

---

[56] *Id*. at ¶¶ 145–147.

[57] *Id*. at ¶¶ 97–104. The allegations in Count III are mostly boilerplate and vague about the conduct that constitutes the breach of fiduciary duty. Nevertheless, the title of Count III reads "Breach of Fiduciary Duty Against the General Partner and Adriani for the Illegal Loans," which suggests that the alleged breach relates to the making of the Hassan loans.

[58] *Id*. at ¶ 110.

[59] *Id*. at ¶¶ 116–125.

[60] *Id*. at ¶¶ 127–131.

money to Hassan, a concealment that resulted in the Plaintiffs investing in the Partnership.[61]

Count IX seeks to pierce the corporate veil of the General Partner and Haven Chicago "so as to hold Adriani jointly and severally liable."[62] Count X seeks a declaratory judgment that Adriani and the General Partner are not entitled to advancement of attorneys' fees.[63] Count XI seeks an accounting of Adriani, the General Partner and Haven Chicago to determine the extent of commingling of Plaintiffs' investment with assets of Adriani and those entities, as well as the extent the Plaintiffs are "entitled to recover on any collections made on the loans to Hassan."[64]

The Plaintiffs seek, among other things, rescissory or compensatory damages as well as costs and expenses incurred in this action.[65] The Plaintiffs moved to expedite the issue of advancement rights. After a hearing on this matter on July 5, 2016, I entered a status quo order and allowed the remaining claims to proceed on a non-expedited basis.

On August 12, 2016, the Defendants moved to dismiss certain claims and answered others. In response, the Plaintiffs filed an Amended Complaint on

---

[61] *Id.* at ¶¶ 133–140.
[62] *Id.* at ¶¶ 151–154.
[63] *Id.* at ¶¶ 157–160.
[64] *Id.* at ¶¶ 162–167.
[65] *Id.* at Prayer for Relief.

12

September 9, 2016. The Defendants subsequently renewed their motions to dismiss and answered other claims on September 23, 2016.

On November 7, 2016, both the Partnership and Haven Chicago filed bankruptcy under Chapter 11 of the Bankruptcy Code. A Suggestion of Bankruptcy and Notice of Automatic Stay was filed on November 10, 2016 (the "Automatic Stay"). Accordingly, the action against Haven Chicago is stayed. In a letter dated November 23, 2016, counsel for the General Partner and Adriani asked this Court to confirm that the Automatic Stay applied to all claims in this pending action.

On December 9, 2016, the Plaintiffs filed the instant motion to "confirm the trial schedule" with respect to their claims against non-bankrupt Defendants Adriani and the General Partner (the "NB Defendants"). The Plaintiffs argue that Counts I, II, IV, VI, VII, VIII, and IX are direct claims and not subject to the Automatic Stay. On January 9, 2017, the NB Defendants filed an opposition to the Plaintiffs' motion, alleging that all claims against them are derivative claims and must be stayed. I heard oral argument on this matter on January 25, 2017.

## II. ANALYSIS

The parties' present dispute concerns the applicability of the Automatic Stay to the claims against the NB Defendants. Three issues are presented: first, whether this Court has jurisdiction to determine the scope and applicability of the Automatic Stay; second, if this Court has jurisdiction, which of the claims against the NB

13

Defendants are derivative and must be stayed; third, regardless of the outcome of those two questions, whether I should nevertheless stay the entire action in the interest of judicial economy.

*A. Jurisdiction*

The preliminary question is whether this Court has jurisdiction to determine whether the Automatic Stay applies to the claims in the pending case. I find the law on this issue is clear: "a non-bankruptcy court has the right to consider whether the automatic stay order applies to matters before it."[66] This rule is consistent with "the idea of [a court's] inherent jurisdiction to determine jurisdiction."[67] It is "clear that it is not the intent of Code § 362(a) to override that authority."[68]

The NB Defendants, citing *In re Mid-City Parking, Inc.*,[69] argue that state courts lack jurisdiction to rule on the scope and applicability of the automatic stay in the first instance, "because [according to the Defendants] such a matter is a 'core proceeding' under 28 U.S.C. § 157(b) as well as an integral part of the overarching

---

[66] *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. 207, 215–16 (Bankr. D. Del. 1995) (sampling other federal and state courts' determination on this issue and finding consensus). *See N.K.S. Distrib., Inc. v. Tigani*, 2012 WL 502899, at *3 (Del. Ch. Feb. 3, 2012) (holding that the Court of Chancery "has jurisdiction to determine whether the stay prescribed by § 362(a)(1) applied to" a news reporter's request for access to confidential expert report and trial transcripts).

[67] *In re Mid-City Parking, Inc.*, 332 B.R. 798, 804 (Bankr. N.D. Ill. 2005).

[68] *In re Conference of African Union First Colored Methodist Protestant Church*, 184 B.R. at 216.

[69] 332 B.R. 798.

bankruptcy 'case.'"[70]  I do not read *Mid-City* as supportive of that position; that case provides that state courts in these circumstances may rule on their own jurisdiction, but subject to collateral attack in the federal courts.[71]

In the alternative, the NB Defendants ask me to refrain from adjudicating this matter because the issue of whether the claims are direct or derivative "inevitably will come in front of the bankruptcy court" and the bankruptcy court, which has the final say on the Automatic Stay, may entertain a collateral attack to void this Court's ruling.[72]  In the interest of efficiency, the NB Defendants ask me to stand down.

In the first instance, it seems unlikely, rather than inevitable, that the bankruptcy court will reach the question of whether the Automatic Stay extends to the claims against the NB Defendants.  In a hearing at the bankruptcy proceeding, Adriani testified that he had no intention to assert any derivative claims against himself or the General Partner.[73]  In other words, in order for the bankruptcy court to be faced with this issue, it would be up to *the Plaintiffs* to bring a derivative case before the bankruptcy court, contrary to their current position that the claims in dispute are direct.  Even assuming that the bankruptcy court would entertain this question, such consideration would not render this Court's determination a waste of

---

[70] Defs' Opposition to Motion to Confirm the Trial Schedule ("Defs' Answering Br.") 9 (quoting *Mid-City Parking, Inc.*).

[71] *See In re Mid-City Parking, Inc.*, 332 B.R. at 805–06 n.3.

[72] Defs' Answering Br. 9–11.

[73] *See* Pls' Response in further Support of Motion to Confirm the Trial Schedule ("Pls' Reply Br."), Ex. 1 at 60:4–10, 61:9–21.

judicial resources.  Rather, because determination of this issue ultimately turns on a question of Delaware law regarding derivative and direct claims, I consider this Court—not the bankruptcy court—in the best position to evaluate the matter.

In light of the foregoing, I conclude that I have jurisdiction to decide the nature of the Plaintiffs' claims and thus inherently determine the applicability of the Automatic Stay to the claims against the NB Defendants.

*B. The Nature of the Claims*

I now turn to the primary issue: whether any of the Plaintiffs' claims against the NB Defendants, Adriani and the General Partner, are derivative and thus subject to the Automatic Stay.

Section 362 of the Bankruptcy Act provides, in part:

> Automatic stay. (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . .  operates as a stay, applicable to all entities, of— (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .[74]

The scope of the automatic stay is broad.  Nonetheless, "the clear language of [S]ection 362(a) indicates that it stays only proceedings against a 'debtor.'"[75]  It is

---

[74] 11 U.S.C. § 362(a)(1)–(3) (2010) (emphasis added).
[75] *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1992).

not available to "non-bankrupt co-defendants of a debtor even if they are in a similar legal or factual nexus with the debtor."[76]  Accordingly, the bankruptcy of the Partnership and Haven Chicago is no bar to the case proceeding against the NB Defendants.

When a suit is brought by stockholders on behalf of a corporation against its non-bankrupt directors and officers, the stockholders "assert[] a cause of action belonging to the corporation."[77]  Upon the corporation's filing of bankruptcy, such derivative claims for injury to the debtor from "actionable wrongs committed by the debtors' officers and director[s] become property of the estate under 11 U.S.C. § 541" and the right to bring the claims "vests exclusively to the trustee."[78]  Under Section 362(a)(3), a plaintiff who asserts such derivative claims would be acting to exercise control over property of the estate and violate the automatic stay.[79]

In this case, the claims against Adriani and the General Partner must be stayed in favor of the bankruptcy proceeding if I determine that these claims are derivative in nature and thus belong to the Partnership.  Conversely, if the claims are direct,

---

[76] *Id*. at 1205.

[77] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[78] *Thornton v. Bernard Technologies, Inc.*, 2009 WL 426179, at *3 (Del. Ch. Feb. 20, 2009) (quoting *In re RNI Wind Down Corp.*, 348 B.R. 286, 292 (Bankr. D. Del. 2006)).

[79] *See In re Black Elk Energy Offshore Operations, LLC*, 2016 WL 4055044, at *2 (Bankr. S.D. Tex. 2007) ("If the claims belong to the estate, it would violate the automatic stay for the [plaintiffs] to exercise control over them") (internal citation omitted).

17

they are the individual property of the Plaintiffs, and do not belong to the bankrupt party. A bankruptcy stay is inapplicable to such claims.

The law of the state of the debtor's formation—Delaware law—governs the issue of the nature of these claims.[80] Under Delaware law, the test for whether a claim is derivative or direct is set forth in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[81] Specifically, two questions must be answered under *Tooley*: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[82] To prove a claim is direct, plaintiffs must "demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[83] Our Supreme Court has noted that "[t]he *Tooley* direct/derivative test is substantially the same for claims involving limited partnerships" as it is for claims involving corporations.[84]

Among the claims that the Plaintiffs argue are direct,[85] Counts I, II and VIII can be properly characterized as the "Contract Claims," Count IV as the "Fiduciary

---

[80] "Whether a claim is derivative or direct is a question of (state) law." *In re SemCrude L.P.*, 796 F.3d 310, 316 (3d Cir. 2015) (internal citation omitted).

[81] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

[82] *Id.* at 1033.

[83] *Id.* at 1039.

[84] *Culverhouse v. Paulson & Co., Inc.*, 133 A.3d 195, 198 n.9 (Del. 2016) (citations omitted).

[85] The Plaintiffs are willing to forbear pressing Counts III, V, X, and XI while the Automatic Stay remains in effect, and thus I have not considered them here. Pls' Motion to Confirm the Trial Schedule ("Pls' Opening Br.") 14 n.10.

Duty Claim," and Counts VI and VII as the "Fraud Claims."[86]  I analyze each in turn below.

### 1. The Contract Claims

The Plaintiffs initially argued that the Contract Claims were direct because they related to the contract terms of the LPA and thus were properly excluded from a *Tooley* analysis, a position supported by certain decisions of this Court.[87]  Since the matter was briefed, this area of the law has been clarified by our Supreme Court, in *El Paso Pipeline GP Co. L.L.C. v. Brinckerhoff*:[88]

> when a plaintiff asserts a claim based upon the plaintiff's own right, such as a claim for breach of a commercial contract, *Tooley* does not apply.  [But our caselaw] does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*. Nor does it mean that [plaintiff's] status as a limited partner and party to the LPA enable him to litigate directly every claim arising from the LPA.  Such a rule would essentially abrogate *Tooley* with respect to alternative entities merely because they are creatures of contract.[89]

In light of the Supreme Court's holding in *El Paso*, I find the *Tooley* test applicable to the Plaintiffs' Contract Claims, even though they are specifically based on the contractual terms in the LPA.[90]  The Plaintiffs conceded this point during the oral argument.[91]

---

[86] Count IX is not substantive; it seeks to pierce the corporate veil of the Defendant entities to hold Adriani personally liable for their actions.

[87] Pls' Opening Br. 9–10.

[88] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).

[89] *Id*. at *9.

[90] Compl. ¶¶ 86, 93, 144, 147.

[91] Oral Arg. Tr. 16:5–8 (Jan. 25, 2017).

I now turn to the specific counts sounding in contract. Count I alleges that Adriani and the General Partner breached the LPA by loaning "unsecured money to Hassan" in violation of the purpose provisions in the LPA.[92] Initially, under *Tooley*, this count appears derivative, as the direct result of such mismanagement would seem to be financial loss to the Partnership, and any corresponding recovery would thus flow to the Partnership.[93] However, this Court in equity has recognized that direct claims exist when the entity at issue is a mere pass through entity and the benefits flow directly back to the investors.[94] For example, *Anglo American Security Fund, L.P v. S.R. Global International Fund, L.P.*[95] characterized a claim as direct, rather than derivative, based on the fundamental pass-through nature of the entity involved, and the fact that, if recovery ran to the entity, new investors—who had not been harmed by the wrong at issue—would nonetheless share in the recovery.[96] As a matter of equity, the *Anglo American* Court permitted the matter to proceed directly.[97] The Plaintiffs argue that the Partnership here is "a small pooled-capital

---

[92] Compl. ¶ 86.

[93] *See generally El Paso Pipeline GP Co. L.L.C.*, 152 A.3d 1248 (discussing direct and derivative claims).

[94] *See Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 152–53 (Del. Ch. 2003) ("[I]njuries that result in a direct reduction of the Fund's assets will effect an almost immediate reduction in the capital accounts of each of the existing partners. Such losses confer only a fleeting injury to the Fund, one that is immediately and irrevocably passed through to the partners.").

[95] 829 A.2d 143.

[96] *Id.* at 152–53.

[97] *Id.* at 152.

vehicle with a handful of limited partners, and under the LPA, it is neither entitled to nor required to partake in gains or losses achieved or suffered in connection with the investments Adriani selects."[98] The Plaintiffs also add that two limited partners joined the Partnership almost a year after the Plaintiffs joined and after "a significant amount of money had already been loaned to Hassan."[99] Additionally, the Plaintiffs argue that certain limited partners, excluding the Plaintiffs, were allowed to withdraw their money while the loans were in default.[100] While the Complaint and citations to the record are vague in this regard, it is not clear to me that this count should be stayed. Accordingly, I find that I need a more developed record to determine this issue and this count should go forward to full development at trial.[101]

Count VIII alleges that the General Partner and Adriani breached the implied covenant of good faith and fair dealing by making loans to Hassan. This count is based on the same alleged wrongdoings on the part of the NB Defendants as Count I.[102] Because I find I need a more developed record for Count I, I also find I need a more developed record for Count VIII.

---

[98] Pls' Reply Br. 10 (citing to LPA at 25–26).
[99] *Id.* at 11.
[100] *Id.* at 11.
[101] That is, if the proof at trial establishes that the Plaintiffs have an individual right to damages, the bankruptcy is not a bar to those damages. Conversely, if the proof at trial shows damages to the Partnership, these damages are subject to the bankruptcy.
[102] Compl. ¶ 146.

21

With respect to Count II, the Plaintiffs allege that the NB Defendants breached the LPA by "refusing to produce to [the] Plaintiffs the Partnership's audited financial statements" and "denying [the] Plaintiffs their inspection rights."[103] The inspection rights are contractual rights that run directly to the limited partners themselves, not to the Partnership. Allegations that nondisclosure prevented stockholders of a corporation from exercising their right to an informed vote or from selling their shares state a direct claim running to the individual stockholders, not the corporation.[104] The same reasoning obtains here. The Complaint makes it clear that the Plaintiffs were injured because they were stripped of "their right to withdraw from the [Partnership] or to seek rescission of their investment."[105] In other words, the alleged harm to the Plaintiffs is the deprivation of their right to timely withdraw their investment, a type of injury that the Partnership could not itself sustain. Any

---

[103] Compl. ¶ 93.

[104] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) (stating that "[t]his Court has recognized, as did the Court of Chancery, that where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct."); *Dieterich v. Harrer*, 857 A.2d 1017, 1029 (Del. Ch. Aug. 3, 2004) (finding disclosure claims direct because they were "based in rights secured to stockholders by various statutes."); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *8 (Del. Ch. Jan. 18, 1996) ("With respect to the disclosure claim, such claims are quite obviously individual as they affect the right to vote or the personal right to determine if one will sell or not one's investment"). *See also In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1049–50 (Del. Ch. 2015), *as revised* (May 21, 2015) ("Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws, recognizing that the DGCL forms a part of every Delaware corporation's charter. Classic examples included the right to vote, the right to compel payment of a contractually specified dividend, and the right to own and alienate shares.") (citations omitted).

[105] Pls' Reply Br. 12.

22

monetary recovery arising out of such loss of withdrawal rights would flow directly to the limited partners. Accordingly, under *Tooley*, Count II states a direct claim.

### 2. The Breach of Fiduciary Duty Claim

Count IV alleges that the NB Defendants breached their fiduciary duty of loyalty through the "dissemination of false and misleading disclosures" concerning the Partnership's performance and its exposure to losses resulting from the loans to Hassan, which "destroyed Plaintiffs' right to withdraw their investment from the [Partnership]."[106] I read Count IV to state a theory of breach of fiduciary duties based on false representations by Adriani and the General Partner.[107]

Like Count II, such a disclosure violation involves injury to the limited partners individually and not to the Partnership, and is thus properly treated as a direct claim. The source of the duty, whether contractual (as in Count II) or equitable/statutory (as in Count IV), is not material to the *Tooley* analysis.[108] Because the Plaintiffs here have alleged a distinct injury from the deprivation of their

---

[106] *See* Pls' Opening Br. 10–11.

[107] Although Count IV contains other allegations, the Plaintiffs have repeatedly characterized Count IV as a disclosure claim. *See id.*; Oral Arg. Tr. 28:4–6, 29:20–23.

[108] *See El Paso*, 152 A.3d at 1259 ("[T]he source of the duty owed—the entity's constitutive agreement, *i.e.*, the LPA—does not alone answer the question as to whether [plaintiff's] claim was derivative, direct, or both."); *Gerber v. EPE Holdings LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) ("Regardless of the source of the claim—fiduciary duty or contract—the *Tooley* analysis still provides the basic analytical approach to the direct-derivative question.").

23

right to withdraw their investment from the Partnership, Count IV states a direct claim.[109]

The NB Defendants argue otherwise. They cite *Manzo v. Rite Aid Corporation*[110] for the proposition that a breach of fiduciary duty claim "based upon the mere fact of knowing misrepresentation is necessarily derivative."[111] However, *Manzo*, a pre-*Tooley* case, must be read in its context. The *Manzo* court found the "mere fact of knowing misrepresentation" insufficient for a direct claim because the obligations of being truthful in communications with shareholders are dual in nature—they are owed "*both* to the shareholders and to the corporation itself."[112] The *Manzo* court, however, did not hold a breach of fiduciary duty claim based on a misrepresentation to be absolutely derivative; instead, "to state a direct claim on that basis," the Court required additional allegations that identified "some resultant injury that either affects some shareholders disproportionately to their pro rata stock ownership, or affects those rights of shareholders that are traditionally regarded as incidents of stock ownership."[113] The Court found that the plaintiff in *Manzo* failed the task, because she only (vaguely) alleged injury from "a poor rate of return on her

---

[109] *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *12–13 (Del. Ch. Aug. 26, 2005) (finding that claims for breach of fiduciary duty based on the nondisclosure allegations were direct).

[110] 2002 WL 31926606, at *1 (Del. Ch. Dec. 19, 2002).

[111] *Id.* at *6.

[112] *Id.* (emphasis in original).

[113] *Id.* (internal quotation omitted).

Rite Aid shares," which was one "suffered by all Rite Aid shareholders in proportion to their pro rata share ownership."[114] Here, however, the Plaintiffs do not claim a diminution of value of their shares due to the nondisclosure; rather, they allege that nondisclosure effectively deprived them of the right to withdraw from the Partnership, a right that is distinct from the dual-natured right to truthful information.[115] Therefore, *Manzo* does not preclude a finding that the Plaintiffs' allegations support a direct claim.

### 3. The Fraud Claims

Count VI alleges that the General Partner and Adriani made false and misleading statements "concerning the [Partnership]'s financial performance, the status of Plaintiffs' investment," and the fact that Adriani made loans in violation of the LPA, which misrepresentations frustrated the Plaintiffs' exercise of their withdrawal rights.[116] Count VII alleges that Adriani induced the Plaintiffs to invest

---

[114] *Id.* at *5.

[115] The NB Defendants also cite extensively, in a two-page block quote, from *In re J.P. Morgan Chase & Co. Shareholder Litigation.*, 906 A.2d 766, 771 (Del. 2006). They do not explain, however, how *J.P. Morgan* may bolster their argument that the Plaintiffs' breach of fiduciary duty claim is derivative. To the extent that the NB Defendants rely on *J.P. Morgan* to argue that a disclosure claim for compensatory damages is always derivative, I find such a reading unpersuasive. The Supreme Court in *J.P. Morgan* found that the plaintiffs conflated their "individual direct claim of liability for a duty of disclosure violation with the compensatory damages flowing from the corporation's separate and distinct underlying derivative claim for waste." *Id.* at 773. In other words, the plaintiffs in *J.P. Morgan* were asking the Court to measure the damage of their disclosure claim by the diminution of the value of the corporation, which the Court concluded had "no logical or reasonable relationship" to the individual right to cast an informed vote. *See id.* This is not what happened here. The Plaintiffs' disclosure claim is tied to their individual right of withdrawal, not the waste of a corporate asset.

[116] Compl. ¶ 127.

in the Partnership by hiding his intent to loan money to Hassan.[117]  Both claims are common-law tort claims that are "[q]uintessential examples of personal claims,"[118] and not potential derivative claims subject to an analysis under *Tooley*.[119]  Both claims arise out of the alleged misrepresentations by Adriani that induced Plaintiffs' investments or prevented their timely withdrawal.  The Plaintiffs—not the Partnership—detrimentally relied upon these misrepresentations.  Therefore, these claims are individual assets of the Plaintiffs and are not subject to the Automatic Stay.

A *Tooley* analysis of both claims would reach the same result.  Count VI describes the harm as the Plaintiffs' inability to "exercise their withdraw rights."[120] Count VII states that the Plaintiffs were injured to the extent they were induced to invest in the Partnership.[121]  As explained before, the right to buy or sell shares is a unique right of the shareholders, as are the analogous rights here.[122]  Under *Tooley*, the harm of any fraudulent misrepresentation was worked on the Plaintiffs, not the Partnership, and recovery based on that harm runs to the Plaintiffs.

---

[117] *See id.* at ¶¶ 133–134, 138.

[118] *In re Activision Blizzard Inc. Stockholder Litig.*, 124 A.3d at 1056.

[119] *See NAF Holdings*, 118 A.3d at 180 (describing personal tort claims as outside of *Tooley* consideration).

[120] Compl. ¶ 130.  The Plaintiffs also assert that the misrepresentations caused them to forgo seeking an injunction to prevent the Hassan loans, itself a direct injury. *See generally Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 1996) (discussing direct nature of claims for injunctive relief), *rev'd on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[121] Compl. ¶ 139.

[122] *See supra* n.104.

The NB Defendants quote *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*[123] presumably for the proposition that the fraud claims are derivative because "the only alleged injury is inextricably linked to a corporate injury."[124] This argument is unpersuasive. *Big Lots* involved a claim brought by a creditor who argued that it was fraudulently induced to refrain from bringing a lawsuit to stop a refinancing transaction that ultimately rendered the company insolvent twenty-two months later.[125] The *Big Lots* Court found the claim derivative because the individual injury claims failed; the plaintiff there, under the facts alleged, could not have made any colorable argument to challenge the transaction at the time, and therefore enjoyed no individual legal entitlement against the defendants based on the alleged fraudulent misrepresentation.[126] By contrast, the Plaintiffs here, under the facts alleged, suffered a tangible individual injury when, in reliance on Adriani's false representations, they made an investment in the Partnership, and when they refrained from exercising their contractual right to withdraw. The injuries the Plaintiffs suffered are thus individual, not "inextricably linked to a corporate injury."[127]

---

[123] 922 A.2d 1169 (Del. Ch. 2006).
[124] Defs' Answering Br. 25 (quoting *Big Lots*, 922 A.2d at 1176–77).
[125] *See Big Lots*, 922 A.2d at 1178.
[126] *See id*. at 1178.
[127] *Id*. at 1176.

27

*C. Judicial Economy*

I have found that certain of the Plaintiffs' claims are their own property, not that of the Partnership, and thus are exempt from the Automatic Stay. The NB Defendants assert that I should nonetheless stay this case because the claims and the parties in this action are so interrelated that it is a waste of judicial resources to continue with this matter. They contend that wasteful overlap will occur between issues here and in bankruptcy. However, neither the NB Defendants nor the Plaintiffs have indicated they would bring any derivative claims in the bankruptcy court.[128] Thus, I do not face the likelihood of two separate courts entertaining two lawsuits based on the same underlying dispute. Moreover, even assuming that the claims I have found to be derivative are brought in the bankruptcy court, the elements and remedies surrounding the fraud and nondisclosure claims would be different from corporate mismanagement claims. For these reasons, I find judicial economy an unpersuasive reason to depart from the normal rule that a bankruptcy stay does not apply to claims against non-bankrupt co-defendants of a debtor "even if they are in a similar legal or factual nexus with the debtor."[129]

---

[128] Adriani testified in a hearing at the bankruptcy proceeding that he had no intention to bring the derivative claims against himself and the General Partner. Pls' Reply Br., Ex. 1 at 60:4–10; 61:9–21. Nor have the Plaintiffs indicated that they would bring such a derivative case in the bankruptcy court.

[129] *Maritime Elec. Co., Inc.*, 959 F.2d at 1205.

## III. CONCLUSION

In light of the foregoing, I find that Counts II, IV, VI, and VII against non-bankrupt Defendants Adriani and the General Partner are direct claims. Counts I and VIII may state direct claims; to the extent they do so, they may proceed as well. The other counts of the Verified Complaint are stayed. The parties should proceed with respect to the direct claims, and to that extent the Plaintiff's Motion is GRANTED. The parties should provide an appropriate form of order consistent with this Memorandum Opinion.